And that brings us to Transit Connection, Inc. v. National Labor Relations Board. And we'll just give the courtroom an opportunity to clear out before we get started on that. Whenever you're ready, Counsel. May it please the Court. My name is Tim Zessen. I represent the petitioner here, Transit Connection, Inc., TCI, which is a private transit company that operates buses on the island of Martha's Vineyard in Massachusetts. We're asking the Court today to overturn the board, the NLRB that is, their decision to certify the union as the exclusive bargaining representative because we assert here that the company substantially complied with the Excelsior rule when they provided current and accurate home addresses for all employees prior to the first election. During that first election, a majority of eligible employees unambiguously voiced that they did not want to be represented by the union. The same group, about 10 years earlier, had rejected the union in a similar fashion. Well, Counsel, didn't the company did have home addresses for some of the employees and had post office addresses, correct? That is correct, Your Honor. And it made a decision just to give out the residential addresses. It had both, so why wouldn't it have been reasonable to give out, to give to the union all the addresses that it had for each of its employees? It seems to me perfectly, you're not sure when the post office delivers, when it doesn't deliver, when you have to pick it up at the post office box. So why isn't the NRLB at least reasonable to say when you have two addresses, give them both? Well, I understand that argument, Your Honor. But here I think it's important to put yourself in the company's shoes and in the people who are making these decisions. You have to understand that the personnel file, the information that the company has when they're making this decision about which address to include is not complete. It's not neatly filed away where you can say this person has this address. This person lives here. The only thing that they really have to go off of that is crystal clear and concrete is the home address listed on each employee's card. Why is it any more concrete and crystal clear than the post office box? Well, the post office box, Your Honor, is something that the company does not use on a regular basis. It doesn't matter whether the company uses it. The question is you're supposed to give the union information so that the union will be able to contact the employee, whether it decides to knock on the front door or send mail. And that's the union's decision. That's not the company's decision. I understand that argument, Your Honor. But you have to understand, again, the situation that we're dealing with on the vineyard is not your typical employee-employer situation. A lot of these employees are seasonal in nature. They have several addresses. Some of them live out of state. It seems to me that would be even more reason to give the addresses that you have. If you know some of the addresses may be unreliable and then let the union figure that out. But the point that we're trying to make here, Your Honor, is that the addresses on the driver's license, which is a clear requirement of the job, are the only ones we know to be true and accurate. I thought the evidence said that the company had in its files mailing addresses for about 60 to 70 percent of the drivers. The record does say that. That's what the record says? And also that the reason only the residential addresses were given was to be consistent across all employees. I think that's a partial explanation for why it was done that way. But ultimately, those addresses were chosen and not the many others that we have in our files, maybe email addresses, out-of-state addresses, P.O. boxes that we don't use. I mean, these could be 5, 10 years out of date. We don't know their current. If we had given the inaccurate P.O. box and that had got returned, we would be here as well. So we were in a lose-lose situation, it seems like. And it could have been resolved by simply putting in the NLRB notice something that says, please provide an address that will allow the union to mail things to employees. If you look at the NLRB notice, it's completely ambiguous. It just says provide the name and address of all employees. We did that clear and in a way that was reasonable and that would allow the union to talk with any one of these folks. So I understand this concern that the board has about not providing some of the P.O. boxes in there. But the fact of the matter is, there's a reason why we never use those. There's a reason why we don't require employees to provide a mailing address. It's because the system, the mail system on the island is quirky. It's not reliable. And I don't think there's any rule. My understanding is you never mail anything to employees anyway. So you don't use the addresses. Everything is done by hand. That's correct, Your Honor. And that's exactly why. So that you don't know. So it seems to me that the prudent thing to do would be to provide all the information you have. If you're not accustomed to mailing either post office box or to residential addresses, you just give everything you have. But again, you have to understand what we're dealing with. It's not we don't have a clear database of all employees' P.O. boxes. We have employment applications from 10 years ago that may have a P.O. box. There's no knowing whether that's accurate. And if you say, here's everything we have, guys. Good luck. Go try to find them. If one of the three addresses that we provide is inaccurate, we're going to be here again. And I'm just saying that it's a very difficult rule to follow if you don't know what the rule actually requires. And to say, just, you know, open up your books. Give them everything you got. Why not e-mail addresses? Why not phone numbers? Why not out-of-state addresses? Well, but that's not really the case here. Because here, the company knew that if you mail it to a residential address in this particular place, it may not reach the person. And yet at the same time, the company's arguing that it was arbitrary and capricious for the hearing officer to conclude that the company should have known. In other words, you're saying that the union should have known, but then you're saying it was arbitrary and capricious for the hearing officer to conclude that the company should have known about the problem with the residential addresses. So I think the testimony at the board hearing below is that the general manager of the company had a general understanding that a lot of people use P.O. boxes on the island. He did not testify that, you know, nobody could receive mail at their home address. That's not the case here. But at the very least, he knew there was a problem with providing only residential addresses, right? He did not know that that would be a problem, no. Because the rule is that you have to provide current and accurate addresses for all employees. And he, in fact, did that in this case, Your Honor. I mean, a lot of, and I'll just quickly cite to some of the, discuss some of the cases that the board has decided on this issue. And they all deal with, quote-unquote, inaccurate address situations. Ones in which the company, instead of saying John Smith lives at 123 Main Street, lives at 321 Main Street, clerical errors. Or providing addresses that are not current or up-to-date. That is not the situation here. None of the cases that have been decided by the board before, or any of the circuit courts, have dealt with this situation where you have an unreliable mail system. And as a result of that, the company chooses. If that's the case, if, as you construe it, none of the cases have dealt with this where you have an unreliable mail system, et cetera, in your view. Why is it arbitrary and capricious in an instance of first impression for, as you've described it, I guess, right? For the board to have decided the way that it did. It is arbitrary and capricious to decide as they did here because the company fully complied with the spirit and the letter of the law. There's no requirement anywhere that I'm aware of that says you have to provide mailing addresses to the employees. That's not necessarily the purpose of the Excelsior Rule. The purpose of the Excelsior Rule, as discussed in that case and in subsequent cases, such as RightCare, is to allow the union to make face-to-face appeals with the eligible employees. Well, what happens if there were 250 bus drivers? Would it be realistic to think that a union was going to go out to 250 homes and not mail any literature to the drivers? I don't represent the union. They certainly could do that if they wanted to. But that's a little unrealistic. They should have the flexibility, shouldn't they, to mail literature to people, to come to a meeting? This is why you should vote for the union. That would be a very reasonable requirement, Your Honor, if the NLRB had simply made it clear. Don't you think that's a reasonable – it's implicit at the very least that the union is going to be mailing literature to people and not necessarily visiting every home? Well, here, Your Honor, they didn't mail anything until 20 days after they were provided with the information. They also had other information in their records from the authorization cards and from previous elections that these employees may have used a different address to be contacted through the mail. And that, I think, was a reasonable thing for the company to assume that the union would be able to do in these circumstances. Thank you. Thank you. Good morning, Your Honors. May it please this honorable court, Greg Sotero on behalf of the National Labor Relations Board. I'd like to begin by clarifying just one little piece. And actually, to our detriment, the standard is an abuse of discretion, not arbitrary, and whether the board acted in an arbitrary and capricious manner. So it's a slightly higher standard, but even so, we are still quite confident that we meet that standard. When the board introduced the Excelsior Rule in 1966, what it said is the purpose of this rule is to ensure that all employees are fully informed so that they can freely decide how to vote in representation elections. And the board has overseen countless elections since then and has had many times the opportunity to reaffirm that in order for that to work, in order for employees to be fully informed before they vote, the employer has to provide complete and accurate address information for those employees. And nobody in those 50 years since the Excelsior Rule has ever questioned that at a minimum, a complete and accurate address involves a residential address and a mailing address. Now, this isn't a case about the board trying to expand the Excelsior Rule, as TCI said in its brief. What it is is TCI actually trying to narrow the existing rule and limit the ways in which unions can communicate with employees. If you consider my opposing counsel, Mr. Zessen, said put yourself in the company's shoes. Well, let's put ourselves in the union's shoes for a second. The union is on the mainland. Martha's Vineyard is an island. I'm not sure how long it takes to get to the island from where the union is located, but in Cape Cod traffic, I can assume it's pretty long. The union representative can't be on Martha's Vineyard knocking on doors trying to see if people are home or anything like that all the time. As Judge Bartle mentioned, we have a small-ish unit here of about, I think, overall 60 employees. In certain cases, the units are much bigger. Those are just not realistic expectations for a union to find every last employee and knock on their doors. And that's why the board, since the very beginning, has considered that the union should be allowed to reach out to employees not only in person but also by mail. In fact, if you go back to Excelsior, that very first case in 1966, the board invited briefs ahead of time because it knew that it was going to possibly create an important new rule. One of the suggestions made by a group of employers, I believe, was, why don't you require the employer to give the Excelsior list to a mailing service? And that way, the idea was the employees will be protected from harassment by the unions and so on and so forth. And the board said, no, we don't think that the union should be limited to just relying on the mail in order to communicate with employees. It didn't say, no, we want the union to absolutely communicate with them face-to-face. It just said, we think they should be allowed to rely on the mails, but they also should be able to reach out to people directly because what you can communicate is different, whether it's face-to-face, you're talking to somebody, or whether you send them a pamphlet or brochure, something that they can read at home in the calm of their own house after the day of work and inform themselves without having somebody talking at them about things they don't necessarily understand. And so that's really the crux of the issue here. I'd like to also address something that Mr. Zessen said, which is that the employer only provided a residential address because those were the only ones known to be accurate. There's nowhere in the record that that is mentioned, that Mr. Morris made that decision based on a concern about the accuracy of the mailing address. What the record says is that Mr. Morris, knowing that in order to send a piece of mail on Martha's Vineyard you have to provide a PO box, consciously decided not to provide those PO boxes and instead provide what he called a consistent list of just residential addresses. So there was no concern about whether the PO boxes might be accurate or the fact that he didn't know whether they worked or not. Another point I'd like to make quickly is that the notice of election that Mr. Zessen claimed was ambiguous. Again, it's going back to this idea that just saying address without qualifying home or residential is ambiguous. There is a common understanding for that term in common parlance, and that is both where you will find somebody and where you will be able to send him a piece of mail or her a piece of mail. What is happening here is that we have, and we understand this, the board did not find that there was any malicious intent on TCI's behalf. But what we do have here is a situation where we have an employer essentially arguing that because they live in a zone that's not quite like everywhere else, or most other places, where you have this quirky mailing system and these two different types of addresses, then that exception should somehow swallow the rule that under Excelsior an address is both a residential and a mailing address. And you can't just do that, especially not overturn 50 years of precedent that has been reaffirmed time and time again. I'd like to just point out, as we've said in our brief as well, that the issue here, again, is not that the employer did not have the mailing addresses or anything like that. All of that information was available in its files. Yes, it took a little bit of digging, sure, but certainly less than it would have taken for the union. And that's why, since the very beginning, the board has placed the burden on the employer to create the Excelsior list because they typically, they deal with employees every day, and therefore they typically have all that information, if not on one sheet, ready to go, at least available in their file so that they can compile it. So if the company had not had the mailing address in its files, then would it have been sufficient for them just to provide the residential addresses? I'm always loathe to say what the board would have ruled in a different set of circumstances, but I will say that in the past, and I believe it was in the Bronfman case, the employer provided a bunch of addresses that were inaccurate. And then after the fact, the board found a new set of addresses, and the employer found a new set of addresses, and the board asked the employer to provide those addresses to the union, and the employer refused. And the board found that the employer had acted unlawfully by refusing to provide these new accurate addresses that it had in its files. The board said, however, that it was not creating rule that the employer had to go on some investigation to uncover and verify whether the addresses it had were correct. So although, again, I would not want to prejudge what the board might say based on that case, I would think that if TCI had provided all of the address information in its files and somehow all of the mailing addresses were wrong, and it didn't know about it, and it didn't have any other more up-to-date information, I don't think the board would be here right now. I don't know if you have any other questions about this case, or if you'd like me to talk about the threat issue, which frankly I don't think is really worth discussing, but I'm happy to answer any questions you'd like. It's your time, and you can do what you'd like. Well, I will just say that for the threat issue, I think it's quite obvious, as I'm sure you have watched that video, that what was happening was very relaxed joking and banter between a bunch of good friends who know each other well and were able to talk about heady stuff like union elections and not get all serious about it all the time. And the employer, when the employer found out about it, never went to the authorities, so I think one can infer that the employer didn't think it was much of a threat either. I would agree, Your Honor. I would say that when your first reaction is to call your attorney to see if you can overturn a union election instead of calling the police because somebody threatened to kill somebody else, I think you have a pretty good sense of how realistic that person thinks the threat is. And in this case, clearly the employer's reaction betrays the fact that they knew this was just a joke and they thought that they could get some mileage out of it. To prolong this process, frankly, it's been – the second election happened in the fall of 2015. We're here at the beginning of 2018. This is really just an attempt to drag on the process in the hopes that over time the union will be weakened and employees will lose interest and it will be easier to decertify in the future. And so, in the spirit of hastening a decision, I will relinquish the rest of my time unless you have any further questions. Actually, I do have one other question. Please do. I assume that you – and I don't – I think there's jurisdiction here, but I assume that you don't take any issue with whether there's jurisdiction in the Eleventh Circuit as opposed to the First. No, we had a back and forth early on where we asked TCI to provide us with some support for why they were seeking jurisdiction here because we were surprised as well. And it turns out that Mr. Pigman, who I believe is here in the audience and who owns – did I say the name right? He, I believe, owns the company, the contracts for that. He lives here in Florida and his business is here in Florida. So, we decided not to contest that. We do not question the jurisdiction of this court. Okay. I mean, as you know, the court is required to make a sua sponte. Sure, absolutely. If you were to question that, then I assume you would ask Mr. Zessen to provide you with the necessary documents. We did not feel, based on what you told us, that there was any basis to contest the jurisdiction of this court. I mean, there is essentially a proffer, I guess, in the record. I just wanted to double-check. Thank you. Thank you. And just to confirm what my brother just stated, we did have a back-and-forth regarding venue, and I provided him with several documents showing that many of – a lot of TCI's operation, their payroll, accounting, is performed out of an office in Florida, and that's the basis for this court having jurisdiction over the matter. Thank you for the clarification. I appreciate it. Just a few brief points to rebut some of the board's arguments here. To suggest that the first thing that the company did when they saw this video was to call their attorney to see if they could overturn the election for the purposes of prolonging the process, I submit is a complete mischaracterization. With all respect to my opposing counsel, that is certainly not how it happened. What happened was they found the video, and just like you, we saw the video. They were laughing. It seemed like they were joking. But a threat is a threat, and whether he could – Well, I mean, a threat is a threat, meaning if it's actually a threat, it's a threat. But if words, I'll kill you, are a joke and everybody – they're intended as a joke and they're taken as a joke, then they're not a threat. They're a joke. I understand that argument, but in this – Well, it's not really an argument. I mean, isn't that the definition of what a threat is? Doesn't a threat have to actually have some – at least either an intent to make a threat or to be understood – understand it as a threat? I mean, doesn't at least one of those things have to be present for it to be a threat by definition? I don't know about you, members of the panel, but when I joke around with my friends, I don't joke about killing them, period. And these guys may be blue-collar workers and have a different sense of humor than I do, but the mere utterance of those words, we're going to kill them, I think those carry a lot of weight, whether it was said in jest or whether if it was – they actually intended to kill him. So let me ask you something. Do you have any reason to believe that the person who said the words intended to kill the person who heard the words? And do you have any reason to believe that the person who heard the words understood that his life was in danger? I don't know the speaker's – I don't know his demeanor. I don't know his background. I don't know if he's capable. It really goes to, right, was it unreasonable for the board to determine – or, you know, the judge who was looking at it to determine that it wasn't a threat? I think it was not reasonable for them to conclude that because you have to look at all the factors. You look at the closeness of the election. Here it was really one vote off. Again, I think really what it centers on is whether a reasonable person looking at this would have any reason to believe that either it was truly intended as a threat by the person who said it or it could reasonably and fairly and was reasonably and fairly understood as a threat by the person who heard it. I think if you put yourself in Mr. Edwards' situation, he was – it appears on the fence about who he was going to vote for in the election. And these guys were teasing him about it, threatening him to harm him, to kill him if he didn't vote for the union. You also have to look at the fact that the turnout in the second election was significantly lower than it was in the first election. So something happened. I don't know what, but certainly this is a reasonable – looking at what was said in this video, it's reasonable to assume that other things happened. We don't have surveillance footage everywhere. Okay, but that's not really the test, right? The test is whether the board abused its discretion in deciding that this was not a threat. And so for that, we need to look at – we sort of need to break it down, right, and figure out how the board allegedly abused its discretion. So can you point to something specific that shows that it was unreasonable and an abuse of discretion for the court to conclude that this was not a threat? Our argument here is that the standard in itself, I think it's a five-prong standard, is not reasonable today. You have this situation where you really have to go overboard and threaten people, and threaten a lot of people, the day before the election, then repeat it an hour before the election, just to maybe get the board's attention. I don't think in today's day and age it's reasonable to require that level of seriousness. So just to make sure I understand, your problem is with the test, not with the specific facts in this case, as to what actually may or may not have happened. I think that's a fair way to put it, Your Honor. Okay. Thank you, counsel. Thank you for your time.